S. Mort ZIMMERMAN, Appellant,

v.

G. E. ADAMI et al., Appellees.

No. 16836.

Court of Civil Appeals of Texas.

Fort Worth.

June 2, 1967.

Rehearing Denied Sept. 15, 1967.

Goldberg, Alexander & Baker, and James A. Baker, Dallas, for appellant.

Lattimore & Lattimore and Hal M. Lattimore, Fort Worth, for appellee G. E. Adami.

Simon, Crowley, Wright, Ratliff & Miller and Kleber Miller, Fort Worth, for appellees Morris B. Parker and D. C. Pitts, Jr.

OPINION

MASSEY, Chief Justice.

Suit to reform contract because of mutual mistake. Judgment entered was against defendant S. Mort Zimmerman, based upon jury findings that he personally agreed prior to plaintiffs' execution of a certain contract that he would indemnify them against all debts and obligations of Admiral Motor Hotel of Texas, Inc., that he as well as the plaintiffs intended that the contract in question would contain a provision providing for such indemnity, and that the failure of such contract to include such a provision was the result of a mutual mistake of fact on the part of all parties thereto.

We reverse and remand.

■ In our opinion the state of the record is such that to find that Zimmerman was laboring under a mistake was so against the great weight and preponderance of the evidence as to be manifestly unjust. Especially is this conclusion fortified when it is remembered that evidence to support allegations of mutual mistake in a suit to reform a contract should be of the most clear and satisfactory character to the effect not only that there

has been such a mistake but that the alleged intention of the parties to which the contract is sought to be made to conform continued concurrently in the minds of all parties down to the time of its execution. See authorities in 33 Tex. Digest, "Reformation of Instruments", ☞45, "Evidence—Weight and sufficiency".

The contract sought to be reformed reads as follows:

"PLAINTIFFS' EXHIBIT #1

"BILL OF SALE

"KNOW ALL MEN BY THESE PRESENTS:

"THAT for a good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the undersigned individuals (hereinafter called "Sellers"), do hereby BARGAIN, SELL, ASSIGN and CONVEY to EXCHANGE ESTATES, INC. (hereinafter called "Purchaser"), the number of shares of the capital stock of Admiral Motor Hotels of Texas, Inc. as is set forth following their respective names below.

"As partial consideration for this sale Purchaser hereby agrees to indemnify and hold harmless the Sellers as to any and all obligations or liabilities stemming from *the construction, equipping, furnishing, and/or* the operations of the Admiral Motor Hotel located at Arlington, Texas, from the inception of the corporation, including but not limited to any and all liability arising by virtue of the Sellers appearing as comaker, endorser or guarantor on any notes issued by Admiral Motor Hotels of Texas, Inc., the proceeds of which were utilized in *the construction, equipping, furnishing and/or* the operations of said corporation, *from the inception of said corporation.*

"As further consideration for this sale Purchaser has herewith delivered to Sellers individual checks in the aggregate amount of $3,000.00 divided among the Sellers in the same proportion as the number of shares sold by each individual Seller bears to 490.

"As additional consideration Purchaser hereby agrees that from and after this date it shall be primarily liable for the unpaid balance of that certain notes

10/31 – $8,820
executed by Sellers dated 11/25 – $9,200
in the original principal amount of $18,020.00                                     State
~~$18,000.00~~, payable to Arlington ~~National~~ Bank, Arlington, Texas.

"It is understood and agreed by Purchaser that all shares of stock purchased hereby are at the present time pledged with the Republic National Bank of Dallas as additional collateral for a loan to Admiral Motor Hotels of Texas, Inc. (and are also subject to an additional lien of S. Mort Zimmerman), and that the shares hereby acquired are taken subject to the rights of the Republic National Bank of Dallas (and S. Mort Zimmerman).

"Attached hereto are duly executed stock powers, executed by the individual Sellers transferring to Purchaser all of their respective interest in and to aforesaid, shares, subject to the rights of the Republic National Bank of Dallas and S. Mort Zimmerman.

"For the consideration recited above Sellers do also hereby BARGAIN, SELL, TRANSFER and ASSIGN to Purchaser a promissory note or notes of Admiral Motor Hotels of Texas, Inc. dated 10/31 & 11/25, in the aggregate principal amount of $18,020.00
~~$18,000.00~~.

"Sellers hereby release Purchaser, S. Mort Zimmerman and Admiral Motor

Hotels of Texas, Inc. of any and all claims of every nature whatsoever which they individually or collectively might have at this time, except that nothing herein is to be construed as releasing Admiral Motor Hotels of Texas, Inc. of any liability or obligation to make payment on any notes· or indebtedness which is hereby assigned to Purchaser.

"Purchaser and S. Mort Zimmerman, individually, hereby release Sellers of any and all claims of every nature whatsoever which Purchaser or S. Mort Zimmerman, individually, might have at this time, except as might arise under and by virtue of this Bill of Sale.

"EXECUTED THIS 13th day of July, 1964.

| "Signatures: | No. of Shares Sold |
|---|---|
| "/s/ Homer H. Newman | 120 |
| "/s/ Morris B. Parker | 120 |
| "/s/ D. C. Pitts, Jr. | 30 |
| "/s/ G. E. Adami | 100 |
| "/s/ Monty Gray | 120 |

SELLERS

"EXCHANGE ESTATES, INC.

"By  /s/ S. Mort Zimmerman, President
　　　"S. Mort Zimmerman, President

PURCHASER

"/s/ S. Mort Zimmerman
　　　"S. Mort Zimmerman, Individually"

———◇———

In the foregoing instrument the emphasis supplied to certain words of the second paragraph is our own. As submitted to plaintiffs the contract did not contain the words we have emphasized. They were inserted at the instance of one or more of the plaintiffs after consultation with an attorney.

The trial court held that the contract was not ambiguous. We agree. It is clear therefrom that Zimmerman, individually, was party thereto only insofar as he was released by the plaintiffs and as he released the plaintiffs. He was the president of Exchange Estates, Inc., and in such capacity he executed the contract for that corporation. According to the contract only Exchange Estates, Inc., (as "Purchaser") agreed to any indemnification. Plaintiffs' theory is that the contract was— and should have read—that Zimmerman as well as Exchange Estates, Inc. agreed to the same indemnification.

It will be noticed from the signatures on the contract that one seller was Monty Gray. Of all the "sellers" thereon listed he is the only one who was not a party to the suit. In other words all the other "sellers" were plaintiffs but Monty Gray was not. Plaintiffs place great reliance on the testimony of Gray, as a disinterested party. From the statement of facts it is apparent that he was present at the meeting held pursuant to consummation of the contract and there held conversation with Zimmerman where matters material to the litigation were stated by him. The conversation was apparently held when all interested parties were present.

On direct examination Gray testified, as follows:

"Q. Well, did you ever get down to the point of asking him whether he was saying 'I'm going to do it,' or just 'We are going to do it'?

"A. He said, 'I'm going to do it.'

"Q. He said, 'I'm going to'?

"A. Yes.

"Q. Are you sure, Monty?

"A. Yes, I am sure.

"Q. Did you have any conversation with him about why his name appeared on there individually on that contract?

"A. No, sir, I did not.

"Q. Now I want to be sure about this because you have used a lot of pronouns, you know we and they and he and I. Are you certain that he said, 'I'm going to protect everybody,' or did he just say, 'We're going to protect everybody'?

"A. He said, 'I'm going to.'

"Q. Had you made it plain to him that you were concerned about the Doctor and yourself?

"A. Well, this was the reason for getting me there was to get me to sign this thing. And I wasn't going to sign it until I was assured that it was going to be taken care of.

"Q. Now what do you mean by taken care of?

"A. By all of the things that were the bank's and the bills that were past due and the operation in general, the whole operation was going to be taken care of financially."

At another point in response to cross-examination Gray testified:

"Q. And in making these statements to you, did Mr. Zimmerman ever say, 'I'm not going to be personally on that'?

"A. No, sir, he did not.

"Q. In his statements to you, did he use the statement, 'I am going to see that your problems are over'?

"A. Yes, sir, he did.

"Q. And 'I'm going to see that these notes are paid'?

"A. Yes, sir.

"Q. And 'I'm going to see that you are taken care of in this deal'?

"A. Yes, sir.

"Q. Did he ever mention the Exchange Estates, Inc. in the deal?

"A. No, sir, I don't believe the corporation was mentioned.

"Q. He never even mentioned the corporation in his whole approach to you, and 'This is something that I'm going to take care of'?

"A. Yes, sir, that's right.

"Q. And it was after that conversation that you executed the agreement, the Bill of Sale?

"A. Yes, sir; that was the last thing I did before I left."

Homer H. Newman was the only plaintiff who had held antecedent conversation with Zimmerman concerning the subject of the sale. He had previously participated in a transaction whereby all the stock of Warren Donaldson in Admiral Motor Hotel of Texas, Inc. had been purchased by Exchange Estates, Inc., acting through Zimmerman, its president. Pursuant to that transaction Zimmerman, individually, had contracted to indemnify Donaldson in substantially the same manner that plaintiffs seek entitlement. In connection with the sale by plaintiffs Newman acted in a leading role, for himself and the other plaintiffs (and Gray).

The contract instrument was picked up by Newman in Zimmerman's office and a copy thereof was given to each interested

party. Such was in their possession for more than a day and possibly as long as one week. In any event there was time expired during which the instrument originally secured by Newman from Zimmerman's office was taken to an attorney. As result of consultations with the attorney it was changed by insertion of the interlineated additions in the second paragraph. Newman returned to Zimmerman's office and exhibited the contract as so changed and received his approval thereof before the meeting where the transaction was concluded.

The only evidence directly establishing plaintiffs' contentions upon Zimmerman's intent as of the time when the contract was originally prepared (before the additions by interlineation by plaintiffs) was expressed by Newman's testimony on direct examination, as follows:

"Q. In the oral arrangement and oral agreements that you had with Mr. Zimmerman, did he agree to personally indemnify the minority stockholders and hold them harmless as to the Arlington State Bank note?

"A. I was negotiating for these other people; and with this obligation I made certain that this was, this was requested by the minority, the 49 percenters, and so I made certain that this was part of the indemnity.

"Q. Did he say that he personally, did he ever say that he personally would hold harmless and indemnify the 49% group?

"A. It was associated with the Donaldson sale, and I was to negotiate one with the same indemnity agreement or at least with the same protection as near as could be had; so this included Mr. Zimmerman's personal endorsement.

"Q. Did Mr. Zimmerman use the phrase 'the same as Mr. Donaldson's indemnity'?

"A. I wouldn't know that. I had never seen the Donaldson indemnity.

"Q. Did he ever actually say that he personally would be liable on these debts?

"A. Well, this was what we were selling actually, in a sense, was the obligation to indebtedness. So the answer would be yes."

We are of the opinion that the evidence shows that each of the plaintiffs believed that Zimmerman had agreed to personal indemnification and that they labored under a misconception of the contractual provisions in that they considered that when Zimmerman signed it both in the capacity of president of Exchange Estates, Inc. and as S. Mort Zimmerman, individually, he was individually binding himself to personal indemnification.

However, when the evidence is viewed in a test to determine whether it is sufficiently clear and satisfactory to the effect that Zimmerman had not only made a mistake but that it was his intention that the contract provide for personal indemnification of the plaintiffs up until and inclusive of the very time when it was finally executed and delivered, we feel compelled to the conclusion that the jury findings were against the great weight and preponderance of the evidence. In other words, while we are not prepared to hold that there was no evidence of probative force and effect we cannot say that the evidence is not ambiguous, equivocal or contradictory, and sufficient to support the verdict and judgment in spite of the contradictory evidence introduced in behalf of the defendant. Pegues v. Dilworth, 134 Tex. 169, 132 S.W.2d 582, 586 (1939).

As in the case of other plaintiffs, whose testimony we have not copied, the testimony of Homer H. Newman and Monty Gray (portions of which we have copied) is as susceptible of construction to the effect that it was Zimmerman, in his capacity of president of Exchange Estates, Inc. who was making representations as to intentions concerning indemnification as a construc-

tion to the effect that it was Zimmerman, individually.

The other contentions in points of error have been considered and found to be without merit. They are overruled.

Judgment is reversed and the cause remanded for another trial.